IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MYKOLA YUZHAKOV

  v.        :  Civil Action No. DKC 25-2299

CHARLES RIVER LABORATORIES, INC.,
et al.        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment case alleging sex and national origin discrimination are the motion to dismiss or, in the alternative, for summary judgment filed by Defendant Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human Services ("Defendant"), (ECF No. 36); the motion for leave to file limited surreply filed by Plaintiff Mykola Yuzhakov ("Mr. Yuzhakov" or "Plaintiff"), (ECF No. 49); and the motion for leave to file supplemental memorandum and notice of supplemental authority in support of surreply filed by Mr. Yuzhakov, (ECF No. 51). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss or, in the alternative, for summary judgment will be granted in part and denied in part, and both motions filed by Mr. Yuzhakov will be denied.

I.    **Background**

    A.    **Factual Background[1]**

Mykola Yuzhakov is a young Ukrainian man who arrived in the United States in October 2022 after fleeing the ongoing war between Russia and Ukraine.  (ECF No. 1 ¶ 5).  After arriving in the United States, Mr. Yuzhakov was granted Temporary Protected Status ("TPS").  (*Id.*).  He decided to reside in Maryland and seek employment here.  (*See id.* ¶¶ 5, 7).

On April 29, 2024, Mr. Yuzhakov obtained employment as a veterinary laboratory technician with Charles River Laboratories ("CRL"), a "global scientific research organization that assists government agencies and private companies in animal research and matters related to drug development and disease research."  (*Id.* ¶¶ 6-7).  One of CRL's federal contracts was with the National Institute of Allergy and Infectious Diseases ("NIAID").  (*Id.* ¶ 8).  NIAID is a component agency of the National Institutes of

---

[1] The facts herein are as alleged in the complaint.  The paragraphs in the complaint are misnumbered.  On page 24, after Paragraph 94, the paragraph numbering restarts at 51.  (ECF No. 1, at 24).  The complaint then proceeds with Paragraphs 51, 52, 53, and so forth, until it ends at Paragraph 73.  In other words, there are two sets of Paragraphs 51-73, each with different allegations.  All citations to Paragraphs 51-73 are to the first, correctly numbered set of such paragraphs.  Any citations to allegations in the second, incorrectly numbered set are to the page numbers on which the allegations appear, rather than the paragraph numbers.

Health ("NIH"), which is housed within the U.S. Department of Health and Human Services ("HHS").  (*Id.* ¶¶ 10–11).  Under that contract, CRL assigned Mr. Yuzhakov to work at a NIAID research facility in Rockville, Maryland, where he would be "involved in animal studies on laboratory mice." (*Id.* ¶¶ 7, 12).  Mr. Yuzhakov would work at the Rockville facility "alongside CRL's federal contract employees and under the oversight of a designated facility [v]eterinarian," NIAID federal employee Dr. Julie Holdridge Nichols ("Dr. Holdridge").  (*Id.* ¶ 7).  Dr. Holdridge "was the client representative for CRL's federal contract."  (*Id.* ¶ 13). Although Mr. Yuzhakov would "primarily receive[] his work assignments from CRL supervisors," he would also "receive[] frequent directions from Holdridge."  (*Id.*).

At the heart of this case is the nature of the relationship that developed between Mr. Yuzhakov and Dr. Holdridge.  More to the point, Mr. Yuzhakov identifies a series of interactions that he believes demonstrate inappropriate, sexualized behavior by Dr. Holdridge.

On Mr. Yuzhakov's first day at the NIAID facility, Dr. Holdridge greeted him at the door and introduced herself as "Julie." (*Id.* ¶ 19).  According to Mr. Yuzhakov, Dr. Holdridge never requested that he refer to her by her formal title.  (*Id.*).

3

Before Mr. Yuzhakov received badge access to the facility, Dr. Holdridge continued to open the door for him daily, sometimes "intercepting other staff members" to do so. (*Id.* ¶ 20). She once told him: "Looks like you need rescuing—come on in, you're with me now." (*Id.*). Mr. Yuzhakov viewed these actions as "friendly" and "welcoming." (*Id.*).

From the first veterinary round Mr. Yuzhakov participated in, however, he notes conduct by Dr. Holdridge that he deemed intimate and "unwelcome." (*Id.* ¶ 21). During Mr. Yuzhakov's first veterinary round, Dr. Holdridge "leaned in to smell [his] cologne, drawing the scent from his chest and commenting, 'I like it.'" (*Id.*). When they proceeded to the next room in the round, Dr. Holdridge bent over to reach the shoe covers; in doing so, she "pressed her buttocks into [Mr. Yuzhakov's] groin area." (*Id.* ¶ 22). He "stepped back, startled by the unwelcome touching"; she then turned around, apologized, and put on her shoe cover. (*Id.*).

On another one of Mr. Yuzhakov's early rounds, he and Dr. Holdridge noticed that Malcolm Vaughan, then the Assistant Facility Manager, appeared to be "monitoring" them and "keeping an eye on their interactions." (*Id.* ¶ 23). After Dr. Holdridge asked Mr. Vaughan where he was going next, she told him that they had already been there. (*Id.* ¶ 24). Once he had left, Dr. Holdridge

4

told Mr. Yuzhakov: "He's gone—we don't need him keeping tabs on us."  (*Id.* ¶ 25).

Although it was allegedly "standard practice" for veterinary technicians like Mr. Yuzhakov to rotate every three months to a different laboratory room, Mr. Yuzhakov did not rotate.  (*Id.* ¶ 38).  Dr. Holdridge asked him "if he liked Room 516B and he said yes"; thereafter, "she ensured he remained there."  (*Id.* ¶ 39).  When he asked her whether he would rotate, she replied: "No, honey, I'm not going to allow them to do that."  (*Id.* ¶ 40).  Mr. Yuzhakov alleges that Room 516B "became a space where [she] could frequently isolate [him] and engage in flirtatious behavior," "make physical contact . . . such as massaging [Mr. Yuzhakov's] back and shoulders," and "discuss her personal life" out of view of others. (*Id.*).  Unlike her practice with other veterinary technicians of using a wheeled writing stand to document observations, Dr. Holdridge "would hand [Mr. Yuzhakov] the clinical record book and position herself so that her forearm and torso pressed against [his] midsection while she wrote."  (*Id.* ¶ 41).  And whenever she entered Room 516B, Dr. Holdridge would insist on wearing Mr. Yuzhakov's lab coat, even if another one was available.  (*Id.* ¶ 50).  She would make comments such as "Your lab coat is the only one that fits me just right" and "I always know which one is yours—

it smells like you." (*Id.*). Mr. Yuzhakov never observed Dr. Holdridge wearing the lab coat of any other staff member. (*Id.* ¶ 51). When CRL brought in new lab coats, Dr. Holdridge remarked that they "were very blue just 'like my eyes.'" (*Id.* ¶ 52). Mr. Yuzhakov replied: "Yes, your eyes are blue like this lab coat." (*Id.*).

One afternoon in mid-2024, Dr. Holdridge requested Mr. Yuzhakov's assistance in Room 516B. (*Id.* ¶¶ 26–27). There, she brought out some ointment to be applied to the animals. (*Id.* ¶ 28). But "instead of handing it to [Mr. Yuzhakov] or applying it directly to the animals as procedure would dictate, she placed it on her own fingertip and slowly transferred it onto [his] finger" two times. (*Id.*). He characterizes the "gesture [as] slow, lingering, and unmistakably personal." (*Id.*). She then sat down on the floor and "gestured for [Mr. Yuzhakov] to squat down next to her" so that he could hand her the last cage; when he did so, "she gradually moved her legs to touch [his] own legs, maintaining prolonged physical contact with his body for almost 15 minutes." (*Id.* ¶ 29). At the same time, she told him that "she hadn't been sleeping well and was thinking about getting a tattoo." (*Id.*). She opened her phone and began reviewing her personal messages, at which point Mr. Yuzhakov asked if he could leave. (*Id.* ¶ 30).

Dr. Holdridge "smiled and wished him a great evening," and Mr. Yuzhakov left while she remained seated on the floor. (*Id.*). He describes Dr. Holdridge's behavior in this encounter as "sexualized," and states that it "triggered a gut-level feeling of revulsion and anxiety." (*Id.* ¶ 31).

Mr. Yuzhakov believed that professional advancement was the "only realistic pathway to escape" Dr. Holdridge. (*Id.* ¶ 32). Specifically, he sought Assistant Laboratory Animal Technician ("ALAT") and Laboratory Animal Technician ("LAT") certifications from the American Association for Laboratory Animal Science ("AALAS"). (*Id.* ¶¶ 14, 33). Dr. Holdridge had a long conversation with Mr. Yuzhakov about these certifications, in which she explained various resources, discussed her own professional background, and encouraged him to follow a similar path. (*Id.* ¶¶ 33-34). On November 12, 2024, Mr. Yuzhakov successfully obtained his ALAT certification. (*Id.* ¶ 35). When she heard the news, Dr. Holdridge allegedly "reacted with outsized enthusiasm" and "express[ed] pride," remarking: "Told you I'd get you there—just needed a little push from me." (*Id.*). Later, when she and Mr. Yuzhakov finished a round early and he asked her if she wanted to go through the rooms again, she responded: "No, I could just lock you in a room so you can study for your LAT certification." (*Id.*

7

¶ 36).  Mr. Yuzhakov interpreted this comment as "playful but suggestive."  (*Id.*).

Sometime in late 2024 or early 2025, Dr. Holdridge entered Room 516B and told Mr. Yuzhakov she was tired, "seemingly expecting him to offer a back massage, as she routinely did for him without solicitation."  (*Id.* ¶ 42).  Mr. Yuzhakov ignored her alleged "implied cue."  (*Id.*).  Dr. Holdridge then said, "Sometimes I wonder if anyone would notice if we just disappeared for a while." (*Id.* ¶ 43).  There was an "awkward pause" when Mr. Yuzhakov pretended not to understand. (*Id.*). Dr. Holdridge "began twisting her wedding ring, then removed it, looked at it—and [him]." (*Id.*). She put the ring in her lab coat pocket before hanging it up and leaving.  (*Id.*).  As she was leaving, Mr. Yuzhakov called out, within earshot of other facility staff, "Julie, you forgot the ring in your lab coat pocket." (*Id.* ¶ 44).  She returned "visibly perturbed," took the ring, and said, "That would have been an expensive mistake."  (*Id.*).  For a period after this interaction, Dr. Holdridge "avoided Room 516B and ceased physical contact with [Mr. Yuzhakov] (such as her back massages)," which Mr. Yuzhakov attributes to her allegedly being upset that other staff heard Mr. Yuzhakov's reminder about the ring.  (*Id.* ¶ 45).

On January 23, 2025, Mr. Yuzhakov obtained his LAT certification. (*Id.* ¶ 46). Although Dr. Holdridge had allegedly been "ignor[ing]" Mr. Yuzhakov since his ring comment, she resumed interacting with him at this point. (*Id.*). While they were in the break room together, she observed that he had become qualified for more senior positions and inquired whether he had applied. (*Id.* ¶ 48). She stated in front of others in the break room that she was "very proud" of Mr. Yuzhakov and that "he had set a record by earning the LAT immediately after his ALAT." (*Id.* ¶ 49). Mr. Yuzhakov responded: "Maybe I did it for you, maybe not." (*Id.*).

In early February 2025, Mr. Yuzhakov noticed abnormalities in animals scheduled for transfer that required veterinarian approval before proceeding. (*Id.* ¶ 53). He tried calling Dr. Holdridge from a landline phone, and she picked up on his second attempt. (*Id.*). She apologized for not picking up the first time, saying: "I just ran out of the shower." (*Id.*). Mr. Yuzhakov could hear running water in the background. (*Id.*). He understood her decision to answer his call "as an unsubtle invitation to imagine her in some state of undress" and thus "sexually charged." (*Id.*).

On February 14, 2025, Mr. Yuzhakov gave Dr. Holdridge a bottle of red wine and chocolates as a birthday gift. (*Id.* ¶ 54). Dr. Holdridge said, "Oh my gosh, give me a thing"—they had earlier

9

discussed doing a wine exchange—and wished Mr. Yuzhakov a happy Valentine's Day.  (*Id.* ¶¶ 55-56).  He recalls her "squeals of happiness and delighted laughter" upon receiving the gift.  (*Id.* ¶ 56).  Dr. Holdridge then allegedly "stood on [her] tiptoe[s], initiated a hug, positioned her face nose-to-nose with [Mr. Yuzhakov], and attempted to kiss him."  (*Id.*).  Mr. Yuzhakov allegedly "rejected the kiss by turning his head, did not respond to her 'Happy Valentine's Day' wish, and reminded her that he had simply acknowledged her birthday."[2]  (*Id.* ¶ 57).  It is unclear whether Dr. Holdridge understood the gift to be a birthday gift or a Valentine's Day gift.  Mr. Yuzhakov maintains that he "did not intend this gift as a flirtatious gesture," but rather to restore rapport between them and protect himself from vindictive behavior considering her allegedly "visible frustration at his rejection of her earlier advances."  (*Id.* ¶ 54).

Mr. Yuzhakov believes that the hug and attempted kiss were witnessed by two staff members, whom Dr. Holdridge allegedly noticed when she crouched down to put the gift under her desk. (*Id.* ¶ 57).  He contends that she was "humiliat[ed]" and "responded with calculated vindictiveness." (*Id.* ¶ 58).  Instead of following

---

[2] Mr. Yuzhakov states that this interaction was captured on a phone recording, which is not before the court.  (ECF No. 1 ¶ 56).

10

the allegedly normal course of reporting the incident to CRL facility management or CRL Human Resources ("HR"), she filed a complaint directly with NIH HR. (*Id.*). Mr. Yuzhakov alleges upon information and belief that she told NIH HR she wanted him "immediately banned from NIAID facilities" and she "ensured that a demand for termination was made by NIAID operations staff to CRL." (*Id.* ¶ 59). That same day, Mr. Yuzhakov "complained to his assigned HR employee with CRL, Jessica Richardson, about the sexual harassment and discrimination against him by Holdridge." (*Id.* ¶ 61). He alleges that Ms. Richardson told him she believed him, but that his complaint went "unaddressed." (*Id.* ¶¶ 62, 64). He then alleges, upon information and belief, that CRL terminated him that day, February 14, without proper investigation or opportunity to respond and classified him as not eligible for rehire. (*Id.* ¶¶ 65, 94b).

When Mr. Yuzhakov inquired about his termination, he was allegedly told that "due to [his] position as a TPS-protected immigrant contractor, it was administratively less complicated for NIH to request his removal compared to actions that might be taken against a U.S. citizen" like Dr. Holdridge. (*Id.* ¶ 90). Ms. Richardson also allegedly told him that "the client has already made the decision and we're just following their order," and that

11

"challenging the termination 'doesn't make sense—this isn't like the Russia-Ukraine War.'" (*Id.* ¶ 91).  CRL immediately posted Mr. Yuzhakov's former position to various job platforms.  Over four months later, CRL filled the position with someone who Mr. Yuzhakov alleges upon information and belief is not a Ukrainian man with TPS status.  (*Id.* ¶ 92).

Mr. Yuzhakov filed an Equal Employment Opportunity ("EEO") complaint with NIH on February 22, 2025.  (*Id.* ¶ 66).  He later filed an external charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), as well as complaints to various other agencies and his congressional representatives. (*Id.* at 24-25).  On April 24, 2025, Mr. Yuzhakov received a notice of his right to sue from the EEOC.  (ECF No. 1-1).[3]

---

[3] Although it is not clear from the record, it appears that Mr. Yuzhakov's administrative complaints proceeded along two separate pathways, one against CRL directly with the EEOC, and one against NIH/NIAID within the NIH EEO office.  The EEOC seems to have issued the right-to-sue letter on the complaint against CRL, because CRL is the only entity copied.  (ECF No. 1-1, at 1-2). The NIH EEO office separately notified Mr. Yuzhakov of his right to file a formal EEO complaint on April 21, 2025, (ECF No. 36-8), and he did so the following day, (ECF No. 36-9).  His complaint was accepted for investigation on May 14, 2025, (ECF No. 36-10), and then seemingly dismissed on September 9, 2025, (ECF No. 39-2, at 13-14).  Such separate pathways are consistent with the distinct administrative processes established in Title VII for private employers like CRL, 42 U.S.C. § 2000e-5, and federal employers like NIH/NIAID, *id.* § 2000e-16.

### B.    Procedural Background

On July 16, 2025, Plaintiff Mykola Yuzhakov filed a complaint in which he asserts four claims against Defendants NIH, NIAID, Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS, and Jayanta Bhattacharya, in his official capacity as Director of NIH: Title VII sex discrimination (Count I); Title VII sexual harassment/hostile work environment (Count II); Title VII and Immigration and Nationality Act ("INA") national origin discrimination (Count III); and Title VII and INA retaliation (Count IV).[4]  After the case was briefly stayed in light of the lapse in appropriations, Defendant Robert F. Kennedy, Jr. filed a motion to dismiss or, in the alternative, for summary judgment on February 19, 2026.  (ECF No. 36).  Plaintiff responded on March 19, (ECF No. 39), and, following several extensions, Defendant replied on April 27, (ECF No. 48).

Following Defendant's reply, Plaintiff filed a motion for leave to file limited surreply on May 1, positing that Defendant's reply raised new legal arguments and factual assertions.  (ECF No. 49).  Defendant then filed a corrected reply on May 13, (ECF No.

---

[4] He also named CRL as a defendant, asserts these same four claims against it, and brings two additional state law claims against it.  On August 15, CRL filed an answer.  (ECF No. 10).

50), and did not otherwise respond to Plaintiff's motion. Thereafter, Plaintiff filed a motion for leave to file supplemental memorandum (to respond to the corrected reply) and notice of supplemental authority in support of surreply.  (ECF No. 51). Defendant did not respond.

## II.  Motions for Leave to File Surreply and Supplemental Memorandum

Unless the court orders otherwise, a party is not permitted to file a surreply.  Local Rule 105.2(a).  "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citing *Lewis v. Rumsfeld,* 154 F.Supp.2d 56, 61 (D.D.C. 2001)).

Plaintiff requests leave to file a surreply based on twelve purportedly "new" matters presented in Defendant's reply for the first time.  (ECF No. 49, at 3-6).  Those matters include Defendant's:

14

1) Correction that he does *not* contend Plaintiff failed to exhaust his retaliation claim

2) Assertion that Plaintiff filed suit instead of submitting a rebuttal in the EEO proceeding

3) Repetition of a typographical error in the complaint that Plaintiff was terminated in 2024 instead of 2025

4) Argument that Plaintiff's factual allegations are "naked assertions"

5) Description of Dr. Holdridge as a "seasoned, non-probationary employee"

6) Contention that *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) overruled the pleading standard in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)

7) Reliance on supposedly outdated adverse-action case law

8) Characterization of a case it had not cited previously, *U.S. E.E.O.C. v. CACI Secured Transformations, LLC*, No. 19-cv-2693-JKB, 2021 WL 1840807 (D.Md. May 7, 2021)

9) Argument that Plaintiff's discussion of process is irrelevant to pretext analysis

10) Reliance on an email Plaintiff sent to Dr. Holdridge the day he was fired to show he could

15

not have been suffering from a hostile work environment

11) Description of the complaint as advancing a claim for race discrimination

12) Characterization of a case defining protected opposition

(*Id.*).  In response, Defendant filed a correct reply directly addressing Plaintiff's concerns identified in items (2), (3), and (11).  Specifically, Defendant's corrected reply represents that Plaintiff did submit a rebuttal in the EEO process, that he was terminated in 2025 rather than 2024, and that his complaint does not advance a claim for race discrimination.  (ECF No. 50, at 1).  Accordingly, Plaintiff's concerns as to items (2), (3), and (11) are moot.

None of the other items warrants a surreply.  Item (1) is a correction *in Plaintiff's favor*, thus no further response is necessary.  Item (4) is meritless: Whether a complaint's factual allegations are "naked assertions" is the governing standard under Fed.R.Civ.P. 12(b)(6).  Item (5) objects to supposedly new facts raised in Defendant's reply, but because the court will decline to convert Defendant's motion to one for summary judgment, only the factual allegations in the complaint are relevant anyway.  Items (6), (7), (8), and (12) involve characterizations of case law that

16

the court is equipped to evaluate without further briefing from Plaintiff. Items (9) and (10) are relevant only to a summary judgment analysis, which, as mentioned, the court will decline to engage in at this time. Therefore, Plaintiff's motion for leave to file surreply will be denied.

Plaintiff also takes issue with Defendant's decision to file a corrected reply without leave of court. (ECF No. 51). He requests that the court clarify the procedural basis on which the corrected reply is accepted and moves to file a supplemental memorandum responding to the corrections therein. First, the procedural basis is straightforward: "[D]istrict courts have the inherent authority to manage their dockets . . . with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) (collecting cases). It follows that courts have the inherent authority to permit litigants to correct mistaken filings on the docket. *Cf. Vazquez-Aguilar v. Gasca*, 513 F.Supp.3d 675, 679 (E.D.N.C. 2021) (permitting plaintiffs to rescind their filing consenting to a settlement based on a mistaken reading thereof); Fed.R.Civ.P. 83(b) ("A judge may regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and the district's local rules."). In fact, litigants have an affirmative obligation to

17

correct filings that they later determine were mistaken.  Md. R. Attorneys, Rule 19-303.3(a)(1) ("An attorney shall not knowingly . . . fail to correct a false statement of material fact or law previously made to the tribunal by the attorney[.]"); Local Rule 704 (adopting the Maryland Rules of Professional Conduct); *cf.* Fed.R.Civ.P. 11.  Defendant's corrected reply remedies several inaccuracies in his original reply; it is accepted under the court's inherent authority to manage its docket and in recognition of defense counsel's duty of candor to the court.

Second, Plaintiff's motion to file a supplemental memorandum in response to Defendant's corrected reply makes a mountain out of a molehill.  In a remarkably dense thirty-five-page memorandum, Plaintiff takes issue with Defendant's continued reliance on the same legal arguments despite correcting three facts related to those arguments.  (ECF No. 51-1, at 13-17).  Upon review of the arguments Defendant advances in his reply and corrected reply, the corrections do not materially undercut the arguments to which they relate.  The correction that Plaintiff did submit a rebuttal to Dr. Holdridge's affidavit does not affect Defendant's principal argument that *Plaintiff's affidavit*, which was submitted two months after his NIH EEO complaint, could not save his failure to raise the national origin discrimination claim in his NIH EEO

complaint.   (ECF Nos. 48, at 2-3; 50, at 3).   Likewise, the correction as to the date of Plaintiff's termination has little impact on Defendant's argument regarding retaliation; Defendant's sole use of the incorrect date was a quotation of Plaintiff's own typographical error in the complaint, (ECF No. 48, at 9), and elsewhere Defendant uses the correct date, (*id.* at 11; ECF No. 50, at 11).   And the correction that Plaintiff's complaint does not advance a claim of race discrimination has no impact on Defendant's argument because he nowhere meaningfully argues that Plaintiff fails to state a claim for race discrimination.   (ECF Nos. 48, at 5-9; 50, at 5-9).   Accordingly, no response is necessary to any of the corrections.   Plaintiff's request for leave to file a supplemental memorandum will be denied.

Finally, Plaintiff requests that the court take judicial notice of factual determinations in Judge Chuang's opinion in a separate defamation suit that Plaintiff brought against Dr. Holdridge, *Yuzhakov v. United States*, No. 25-cv-2037-TDC (D.Md.), along with the Westfall Act certifications the government filed in that case.   A court may "judicially notice a fact that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot be

19

reasonably questioned." Fed.R.Evid. 201(b). But "it is well established within the United States Court of Appeals for the Fourth Circuit that facts adjudicated in a prior case 'do not meet either test of indisputability contained in Rule 201(b).'" *Corbitt v. Balt. City Police Dep't*, 675 F.Supp.3d 578, 586 (D.Md. 2023) (quoting *United States v. Zayyad*, 741 F.3d 452, 463-64 (4th Cir. 2014)). Thus, any facts adjudicated in Judge Chuang's opinion are not the proper subject of judicial notice here. As for the Westfall Act certifications, a court may take judicial notice of the fact that a document was filed in another case, but not of the facts within the document for the truth of the matter asserted. *Id.* (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). The Westfall Act certifications are therefore judicially noticeable only as to the fact of their filing. A judicially noticeable fact, however, must be "relevant to the present dispute." *Wireless Buybacks, LLC v. Hanover Am. Ins. Co.*, 223 F.Supp.3d 443, 451 (D.Md. 2016). There is no reason to believe that the simple fact that the Westfall Act certifications were filed in Plaintiff's other suit have any bearing on the present

dispute.  In short, Plaintiff's request for judicial notice will be denied.[5]

## III. Standard of Review

### A.    Conversion

Before addressing arguments made in Defendant's motion, the court must first determine how to analyze it.  Defendant moves to dismiss for failure to state a claim under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56.  (ECF No. 36, at 1).  Defendant attaches several exhibits to his motion, and Plaintiff attaches a series of exhibits to his response in opposition.  Defendant's motion "'implicates the court's discretion under Rule 12(d)' . . . to determine whether to accept evidence outside the pleadings, and thus convert a Rule 12(b)(6) motion to a Rule 56 motion." *Coleman v. Calvert County*, No. 15-cv-920-GJH, 2016 WL 5335477, at *3 (D.Md. Sep. 22, 2016) (quoting *McCray v. Md. Dep't of Transp.*, No. 11-cv-3732-ELH, 2013 WL 210186, at *4 (D.Md. Jan. 16, 2013), *aff'd in part, vacated in part on*

---

[5] Plaintiff points to positions the United States advanced in the other suit before Judge Chuang and contends that they are inconsistent with the positions Defendant asserts here.  (ECF No. 51-1, at 6–13).  He raises judicial estoppel but does not actually request the court to make any decision regarding estoppel.  (*Id.* at 12).  Without any such request, and dubious of any actual inconsistency, the court declines to wade further into the issue.

*other grounds*, 741 F.3d 480 (4th Cir. 2014)) (citing Fed.R.Civ.P. 12(d); *McCray*, 2013 WL 210186, at *4).

In order for this court to convert the motion to dismiss into a motion for summary judgment, two requirements must be met: (1) actual notice to the nonmovant that the conversion may occur, and (2) reasonable opportunity for discovery. *See Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). The first requirement is satisfied when the movant styles its motion to dismiss as a motion for summary judgment in the alternative. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998). This requirement is met; Defendant styled his motion as a "Motion to Dismiss or, in the Alternative, for Summary Judgment." (ECF No. 36, at 1).

The second requirement is satisfied when the party opposing summary judgment has not "made an attempt to oppose the motion on the grounds that more time was needed for discovery" by filing "an affidavit or declaration pursuant to Rule 56(d) . . . explaining why, 'for specified reasons, it cannot present facts essential to justify its opposition,' without needed discovery." *Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 855 F.Supp.2d 524, 542-43 (D.Md. 2012) (quoting and citing Fed.R.Civ.P.56(d); *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002)). Even where the nonmoving party does not submit a Rule 56(d) affidavit,

22

the court can refuse to convert the motion to one for summary judgment "[w]hen the nonmoving party, through no fault of its own, has had little or no opportunity to conduct discovery," the case concerns "fact-intensive issues," and "the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." *Harrods*, 302 F.3d at 244 (citing *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380-81 (D.C. Cir. 1988); *Hellstrom v. U.S. Dep't of Veterans Affs.*, 201 F.3d 94, 97-98 (2ᵈ Cir. 2000); *Farmer v. Brennan*, 81 F.3d 1444, 1449-50 (7ᵗʰ Cir. 1996); *Dean v. Barber*, 951 F.2d 1210, 1214 n.3 (11ᵗʰ Cir. 1992)).

Although Plaintiff did not file a Rule 56(d) affidavit, the second requirement is not met and the motion will not be converted to one for summary judgment. Plaintiff has not yet had an opportunity for discovery because the litigation is in its early stages. Furthermore, Plaintiff's claims involve fact-intensive issues regarding his relationship with Dr. Holdridge, the events of February 14, 2025, the degree of control Defendant exercised over Plaintiff's work, Defendant's knowledge of Plaintiff's complaints, and other disputes integral to employment discrimination complaints.

Finally, Plaintiff's response in opposition to Defendant's motion explicitly resists conversion, stating that "[s]ummary [j]udgment is [p]remature" and the record is not "sufficiently complete to permit judgment as a matter of law." (ECF No. 39, at 30-31). Plaintiff enumerates, if somewhat vaguely, the factual disputes to be resolved following discovery and the documents he seeks access to during discovery. (*Id.* at 31). He has therefore "adequately informed" this court that "the motion is pre-mature and that more discovery is necessary" in his response, which "serve[s] as the functional equivalent of an affidavit." *Harrods*, 302 F.2d at 244-45 (citing and quoting, inter alia, *First Chi.*, 836 F.2d at 1380).

Because the second requirement for conversion has not been met, Defendant's motion will be treated as one to dismiss for failure to state a claim.

### B.    12(b)(6) Failure to State a Claim

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The court "must accept the complaint's factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 469 (4th Cir. 2025) (citing

24

*Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024)). Ordinarily, a plaintiff's complaint must only satisfy the standard of Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed.R.Civ.P. 8(a)(2)).   A Rule 8(a)(2) "showing" requires "stat[ing] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays v. Sprinkle*, 992 F.3d 295, 299–300 (4th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).

## IV.  Analysis

Defendant moves to dismiss Plaintiff's complaint on the grounds that he was not Plaintiff's employer and that, in any event, Plaintiff fails to state a claim on each of the four counts in which Defendant is named.   At this stage, however, Plaintiff has alleged enough to presume Defendant was his employer for the purpose of Defendant's motion to dismiss.   But Defendant is correct

on three of the four counts that even if he was Plaintiff's employer, Plaintiff fails to state a claim. The lone exception is Plaintiff's sexual harassment claim in Count II, which will proceed due to factual disputes regarding the nature of Plaintiff's relationship with Dr. Holdridge and the events of February 14, 2025. Plaintiff will have the opportunity to amend Counts I and IV.

### A.   Proper Defendants

As an initial matter, Defendant moves, in a footnote, to dismiss the other three government defendants—NIH, NIAID, and Mr. Bhattacharya—because Mr. Kennedy is the only proper defendant. (ECF No. 36-1, at 7 n.1). Plaintiff does not appear to oppose their dismissal. Defendant is partially correct. "Under Title VII, civil actions by current or former federal employees must be brought against the head of the federal department that employed the plaintiff, not against component agencies or individual supervisors." *Chang Lim v. Azar*, 310 F.Supp.3d 588, 599 (D.Md. 2018) (citing 42 U.S.C. § 2000e-16(c); *Gardner v. Gartman*, 880 F.2d 797, 799 (4th Cir. 1989)). On the Title VII claims in Counts I–IV, the agency defendants, NIH and NIAID, must be dismissed because they are not the heads of the relevant department, and Mr. Bhattacharya will be dismissed because he is the head of a

26

component agency rather than the department.  As for the INA claims in Counts III and IV, however, the Title VII requirement that only the department head be named as a defendant does not apply.  NIH, NIAID, and Mr. Bhattacharya remain defendants on the INA claims, but those claims will be dismissed against them for the same reasons they are dismissed against Mr. Kennedy.

### B.   Joint Employer Doctrine

Defendant argues that Plaintiff was not employed by NIAID and therefore cannot assert a Title VII or INA claim against it.  (ECF No. 36-1, at 14–16).  At this early juncture, Defendant's argument fails; Plaintiff's complaint survives a motion to dismiss because Plaintiff plausibly alleges that Defendant exercised control over his employment and the nature of the relationship is subject to myriad factual disputes.

Under the joint employer doctrine, two entities can serve as a plaintiff's employer.  Parties are joint employers when "one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer."  *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) (quoting *Torres-Negrón v. Merck & Co.*, 488 F.3d 34, 40 n.6 (1st Cir. 2007)).  *Butler*

27

articulates the following nine-factor test to determine whether an individual is jointly employed by two or more parties for the purposes of Title VII:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* at 414.

The first three factors are "most important" in determining whether a party is a joint employer, but "no one factor is determinative, and the consideration of factors must relate to the particular relationship under consideration." *Id.* at 414–15 (quoting *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997)). Moreover, "control remains the principal guidepost." *Id.* Analyzing the factors above and paying special attention to the level of control exerted by Defendant over

28

Plaintiff's employment, Plaintiff's complaint alleges enough facts to support a claim that Defendant is his employer.

Defendant argues that Plaintiff was a federal contractor, as stated in his complaint, and therefore could not be an employee. (ECF No. 36-1, at 15).  "Given Title VII's remedial intent," however, Defendant cannot "avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship."  *Butler*, 793 F.3d at 410 (quoting *Schwieger v. Farm Bureau Ins. Co. of Neb.*, 207 F.3d 480, 484 (8th Cir. 2000)).

The first factor asks the court to analyze Defendant's authority to hire and fire Plaintiff, pointing toward "ultimate control."  *Id.* at 414.  NIAID's recommendation to terminate Plaintiff had at least some influence on Plaintiff's termination by CRL.  Plaintiff alleges that Dr. Holdridge submitted a complaint to NIH HR regarding Plaintiff after the incident on February 14, 2025.  (ECF No. 1 ¶ 58).  She allegedly communicated to NIH HR that "she wanted Plaintiff to be immediately banned from NIAID facilities" and "ensured that a demand for termination was made by NIAID operations staff to CRL."  (*Id.* ¶ 59).  Plaintiff believes he was then fired the same day.  (*Id.* ¶¶ 65, 94b).  When Plaintiff asked Ms. Richardson at CRL HR about his termination, she allegedly responded that "the client has already made the decision and we're

just following their order." (*Id.* ¶ 91).  There is no indication that CRL was going to fire Plaintiff prior to Dr. Holdridge's complaint or NIAID's demand for termination.  Plaintiff, therefore, has plausibly alleged that Defendant had at least some authority to fire Plaintiff.

The second factor, concerning day-to-day supervision and employee discipline, determines "practical control of the employee." *Butler,* 793 F.3d at 414.  On the face of the complaint, Defendant did exercise at least some supervisory authority over Plaintiff's daily activities.  Although Plaintiff "primarily received his work assignments from CRL supervisors," he also "received frequent directions from Holdridge."  (ECF No. 1 ¶ 13). He alleges that Dr. Holdridge had "supervisory authority" over all CRL staff at the NIAID facility.  (*Id.*).  While she was "not Plaintiff's direct supervisor," (*id.* ¶ 33), she was able to "instruct[] CRL supervisors to assign Plaintiff" to certain rooms at the facility and prevent his reassignment to different rooms. (*Id.* ¶¶ 14, 39-40).  Thus, it is at least plausible that Defendant exercised some degree of practical control over Plaintiff.

The third factor concerns whether the employer furnishes Plaintiff's place of work and the equipment he uses.  *Butler* states that the "third factor, where and how the work takes place, is

30

valuable for determining how similar the work functions are compared to those of an ordinary employee." 793 F.3d at 414-15. While it is true that "consideration should be given to whether the contractor worked side-by-side with the other employees," that is not the ultimate focus of this factor. (ECF No. 36-1, at 16 (quoting *Butler*, 793 F.3d at 414)). Plaintiff performed his work at Defendant's facility; whether the equipment he used belonged to Defendant is unclear. (ECF No. 1 ¶ 7). NIAID employees, as far as the complaint alleges, used the same equipment and place of work as Plaintiff. For example, Dr. Holdridge and Plaintiff used the same shoe covers and ointment and necessarily worked in the same facility. (*Id.* ¶¶ 7, 22, 28). Plaintiff worked "alongside CRL's federal contract employees," (*id.* ¶ 7), but it appears he also worked among NIAID employees, (*see, e.g., id.* ¶ 40). Plaintiff has alleged enough to satisfy this factor, too.

The other *Butler* factors point in different directions or no direction at all. No facts relevant to factor four (possession of and responsibility over the individual's employment records) are alleged in the complaint. Factor five (length of time during which the individual has worked for the entity) leans in Defendant's favor because Plaintiff worked on the contract with Defendant for less than a year. *See Crump v. TCoombs & Assocs., LLC*, No. 13-

31

cv-707, 2015 WL 5601885, at *22 (E.D.Va. Sep. 22, 2015) (determining that a one-year work relationship is "relatively short" when applying the fifth *Butler* factor and weighs against finding an employment relationship). Factor six (whether the entity provides the individual with formal or informal training) is unclear. Plaintiff pursued certifications under the guidance of Dr. Holdridge, but he does not allege whether such guidance was within the scope of her workplace responsibilities. Factor seven (whether the individual's duties are akin to a regular employee's duties) is also unclear, as described in the factor two analysis above. Factor eight (whether the individual is assigned solely to the putative employer) leans in Plaintiff's favor because there is no indication Plaintiff was assigned to any other entity during his time with Defendant. Factor nine (the parties' intention to enter into an employment relationship) is unclear, but this factor is usually "of minimal consequence in the joint employment analysis." *Butler*, 793 F.3d at 414 n.12.

Because the three most important factors plausibly favor Plaintiff, it is inappropriate at this stage to dismiss Plaintiff's claims against Defendant on the ground that NIAID was not his employer.

32

### C.    Count I: Sex Discrimination

Plaintiff's first claim is for sex discrimination.  Title VII protects federal employees from discrimination based on sex.  42 U.S.C. § 2000e-16(a).  "Absent direct evidence, the elements of a *prima facie* case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (italics added) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)), *aff'd sub nom. on other grounds*, *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012).  A plaintiff need not "plead facts that constitute a *prima facie* case in order to survive a motion to dismiss," *id.* (italics added) (citing *Swierkiewicz*, 534 U.S. at 510-15); instead, he "can survive a motion to dismiss a Title VII claim if he simply presents allegations sufficient to reasonably infer a *prima facie* case of discrimination," *Niederberger v. Wegmans Food Mkts., Inc.*, No. 23-cv-2759-JKB, 2024 WL 2866609, at *3 (D.Md. June 6, 2024) (italics added) (quoting *Walton v. Greensville Corr. Ctr.*, No. 14-cv-628, 2015 WL 2452451, at *10 (E.D.Va. May 21, 2015)).  *See also Coleman*, 626 F.3d at 190-91 (assessing whether the plaintiff plausibly

33

alleged elements of a *prima facie* case); *accord Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013) ("[T]he elements of a *prima facie* case may be used as a prism to shed light upon the plausibility of the claim." (italics added)); *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) ("The facts alleged must give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation."). Because Plaintiff offers no allegation of direct evidence of sex discrimination, the question is whether he alleges facts from which a *prima facie* case can reasonably be inferred.

Plaintiff alleges that he was discriminated against on the basis of sex when Dr. Holdridge had Plaintiff regularly assigned to Room 516B and made various types of physical contact with him that Plaintiff perceived to be sexualized. (ECF No. 1 ¶ 70). These allegations are duplicative of Plaintiff's sexual harassment claim, (*see id.* ¶ 79), and will thus be discussed in the analysis of Count II. Plaintiff also alleges that Defendant discriminated against him on the basis of sex because it was deliberately indifferent to the sexual harassment he allegedly suffered, and because Dr. Holdridge filed an allegedly false complaint against him that resulted in his removal from the NIAID facility and

34

termination.  (*Id.* ¶ 72).  As to these allegations, Defendant contests only that Plaintiff has adequately identified a comparator and that it took an adverse employment action against Plaintiff.

Although Defendant's comparator argument is superficially compelling, the unique circumstances of Plaintiff's case counsel against dismissal on that basis.  When a plaintiff presents a claim of discrimination by comparison to employees outside his protected class, he must plausibly allege that those comparator employees are "similarly situated in all material respects."  *Tinsley v. City of Charlotte*, 854 F.App'x 495, 500 (4th Cir. 2021).  A plaintiff who "rel[ies] on comparator evidence [must] identify a specific comparator rather than mak[e] vague assertions that unspecified individuals were treated more favorably."  *Duheme v. Columbia CSA-HS Greater Columbia Healthcare Sys. LP*, No. 11-cv-2902, 2014 WL 468942, at *5 (D.S.C. Feb. 4, 2014) (collecting cases).  At the pleading stage, then, a plaintiff must allege a specific comparator.  Plaintiff offers "vague assertions" that he was treated worse than female employees because he was terminated whereas they were given progressive discipline for unspecified yet ostensibly similar offenses.  (*See* ECF No. 1 ¶¶ 60, 62, 69).

35

Accordingly, those unidentified female employees cannot serve as comparators.

The only female employee Plaintiff does specifically identify as a comparator is Dr. Holdridge.  He alleges that Defendant "treated Plaintiff less favorably than his female supervisor, whose claims were given complete credence based on only a perfunctory and inadequate investigation of her disputed allegations against Plaintiff." (*Id.* ¶ 69).  "While there is no 'bright-line' rule for what makes two comparators 'similar' for purposes of Title VII claims, courts consider 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision.'" *Johnson v. Balt. City*, 163 F.4th 808, 815 (4th Cir. 2026) (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019)) (citing *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019); *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381 (4th Cir. 2022)). Accordingly, courts frequently determine that a plaintiff's supervisor is not similarly situated enough to the plaintiff to serve as his comparator. *Abdelhamid v. Summit Ridge Energy*, No.

36

24-cv-1553, 2026 WL 1303050, at *6 (E.D.Va. May 12, 2026) (plaintiff's supervisor was not similarly situated because the supervisor did not have the "same immediate supervisor" as the plaintiff and was not subject to the same standards); *Steinhilber v. Yanfeng US Auto. Interiors I, LLC*, No. 18-cv-2966, 2020 WL 6219421, at *8 (D.S.C. May 11, 2020) ("[I]t is undisputed that Hill was the plaintiff's supervisor, and, therefore, he is not a valid comparator."); *Collins v. Charleston Place, LLC*, No. 15-cv-4465, 2017 WL 9292232, at *10 (D.S.C. Mar. 24, 2017) (explaining that "a supervisor and a subordinate are rarely similarly situated," and that the plaintiff's supervisor was "no exception to this general principle"); *Cherrey v. Thompson Steel Co.*, 805 F.Supp. 1257, 1262–63 (D.Md. 1992) (determining that the proposed comparator's status as the plaintiff's supervisor was a factor rendering use of that comparator inappropriate). But that is not always the case. At least one court in this district accepted a plaintiff's supervisor as a comparator at the pleading stage because the plaintiff specifically alleged that he was terminated directly by his supervisor's supervisor. *Quiroz v. Empirian Vill. of Md., LLC*, No. 21-cv-2638-AAQ, 2022 WL 1321594, at *4 (D.Md. May 3, 2022). And relevant to the instant case, another court in this circuit determined that a plaintiff's supervisor was a valid

37

comparator where both the plaintiff and the comparator were engaged in inappropriate supervisor-subordinate relationships with other individuals. *Cole v. Lexington-Richland Sch. Dist. 5*, No. 09-cv-1301, 2010 WL 5734781, at \*1, \*7 (D.S.C. Dec. 20, 2010), *report and recommendation adopted*, 2011 WL 441974 (D.S.C. Feb. 8, 2011).

Here, Plaintiff alleges enough for Dr. Holdridge to serve as a viable comparator for now. Although they did not share all the same job responsibilities, there is no indication that Dr. Holdridge was "subject to different standards of conduct" or that her "fate was determined by a different decision maker" with respect to workplace relationships. *Cole*, 2010 WL 5734781, at \*7. If the plaintiff's male supervisor could be her comparator in *Cole* because they both supposedly engaged in different inappropriate supervisor-subordinate relationships, then Dr. Holdridge could be a valid comparator for Plaintiff because each was involved in the *same* allegedly inappropriate supervisor-subordinate relationship. Moreover, Plaintiff alleges that Defendant took Dr. Holdridge's account of what happened on February 14, 2025, at face value and immediately moved to remove Plaintiff from the contract, without any prior complaint regarding Plaintiff or request for Plaintiff's account. In other words, Defendant treated Plaintiff and Dr. Holdridge differently with respect to the same incident. While it

38

is possible that Defendant did so for a legitimate, nondiscriminatory reason, that question is reserved for later. At the pleading stage, Plaintiff need only plead facts from which a *prima facie* case can be inferred, and the *prima facie* burden itself is "not onerous," *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). Defendant's immediate acceptance of Dr. Holdridge's account and decision to remove Plaintiff permanently, without any prior complaint regarding Plaintiff, raises the plausible inference that Dr. Holdridge was believed because she is a woman and Plaintiff is a man.

As for the adverse action element, Defendant is correct that Plaintiff does not accurately identify an adverse action. The federal-sector provision of Title VII protects employees from "[a]ll personnel actions . . . based on . . . [sex]," 42 U.S.C. § 2000e-16(a), thereby "outlaw[ing] a broader range of employer conduct than the [private-sector] provision, which covers activity related to 'compensation, terms, conditions, or privileges of employment,'" *Laurent-Workman v. Wormuth*, 54 F.4th 201, 214 (4th Cir. 2022) (quoting 42 U.S.C. § 2000e-2(a)(1)). Because the parties erroneously focus on the private-sector standard, their papers do not further elucidate the meaning of "personnel action." Although Congress has not defined "personnel action" in Title VII,

39

the Fourth Circuit has explained that it may include a "broader range of activity" than "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Id.* (quoting *Caldwell v. Johnson*, 289 F.App'x 579, 589 (4th Cir. 2008)) (citing *Von Gunten v. Maryland*, 243 F.3d 858, 866 n.3 (4th Cir. 2001)).   Considering a nearly identical federal-sector provision in the Age Discrimination in Employment Act of 1967, which likewise did not define the term "personnel action," the Supreme Court of the United States looked to the definition of "personnel action" in the Civil Service Reform Act of 1978.  *Babb v. Wilkie*, 589 U.S. 399, 405 (2020).  That definition "include[s] most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews."  *Id.* (citing 5 U.S.C. § 2302(a)(2)(A)).

The two allegedly adverse actions Plaintiff identifies in Count I miss the mark.  Beginning with Dr. Holdridge's complaint, it is unclear how the complaint itself constitutes a personnel action.  The relevant action affecting Plaintiff's employment is not Dr. Holdridge's complaint but rather how NIH/NIAID responded to the complaint with respect to Plaintiff.  Although Plaintiff also alleges that NIH/NIAID requested that CRL terminate him in response to the complaint, he does not include that action in Count

40

I and specify it as one of the adverse actions on which he proceeds. That lack of clarity is fatal. The other alleged adverse action is Defendant's supposed deliberate indifference, which is considerably weaker. Even if deliberate indifference can constitute a personnel action, the Fourth Circuit has defined deliberate indifference in a similar context as action that is "clearly unreasonable in light of known circumstances." *Strickland v. United States*, 32 F.4th 311, 359 (4th Cir. 2022) (quoting *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 702 (4th Cir. 2018)) (applying the Title IX standard for deliberate indifference to Fifth Amendment equal protection claims against the federal government for sexual harassment). Plaintiff does not allege that *Defendant* knew of the alleged sexual harassment that Plaintiff complained about to *CRL*. Without such knowledge alleged, it is not plausible that Defendant was deliberately indifferent to Plaintiff's alleged sexual harassment. Because neither of the actions Plaintiff alleges in Count I suffices, this claim will be dismissed. Plaintiff will have the opportunity, however, to amend this claim, as explained at the end of this opinion.

### D.   Count II: Sexual Harassment

Next, Plaintiff asserts a Title VII hostile work environment claim in which he alleges that Dr. Holdridge sexually harassed

41

him.   Plaintiff alleges that Dr. Holdridge's sexual harassment consisted of the following:

> [S]taring at Plaintiff in a sexual manner; using her influence to ensure Plaintiff was stationed in close physical proximity to her in the workplace, preferably in a room where she could isolate him alone and make physical contact she could pretend was purely accidental; massaging Plaintiff's shoulders and back without invitation; bringing up her marital problems in unsolicited fashion and stating aloud that she was thinking about getting body tattoos; invading Plaintiff's personal space unexpectedly and brushing her buttocks against his groin area; leaning in to hug Plaintiff and acting as if she expected him to kiss her (until Plaintiff was forced to turn his head to avoid this uncomfortable situation); and enticing Plaintiff to exchange bottles of wine with her by engaging him in a personal conversation about her favorite red wines.

(*Id.* ¶ 79).

A claim of sexual harassment under Title VII has four elements: "(1) unwelcome conduct; (2) that is based on the plaintiff's sex; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010) (alteration omitted) (quoting *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 192 (4th Cir. 2000)).

42

Defendant argues that Plaintiff has failed to allege the first, third, and fourth elements.

The first element, unwelcome conduct, "is not a high hurdle." *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018). The Fourth Circuit has "recognized two ways to show conduct was unwelcome—by voicing objection to the harasser or employer, or by the character of the conduct itself because 'the nature of the conduct may indicate whether or not the conduct is unwelcome.'" *Gordon v. Heath*, 179 F.4th 263, 272 (4th Cir. 2026) (quoting *Strothers*, 895 F.3d at 328–29) (citing *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008)).  The "second, more contextual approach matters because workplace dynamics do not always make immediate objection realistic," such as where "the alleged harasser is a supervisor" and the plaintiff "reasonably fear[s] retaliation or other consequences from speaking up."  *Id.* In that case, the question is "whether the conduct was unwanted and regarded as undesirable, which may be inferred from the allegations and circumstances."  *Id.* (citing *Strothers*, 895 F.3d at 328–29).

Plaintiff clears the first element's low bar.  Relying on factual allegations outside the four corners of the complaint, Defendant contends that Plaintiff did not find Dr. Holdridge's

conduct unwelcome and instead "was a willing participant." (ECF No. 36-1, at 23-24). Those additional factual allegations, however, are not before the court on a motion to dismiss. Defendant's only other argument is that Plaintiff did not complain of any of the alleged instances of harassment until after Dr. Holdridge made her complaint. (*Id.* at 24). But Plaintiff did not need to complain, because he alleges that Dr. Holdridge was effectively his supervisor. (ECF No. 1 ¶¶ 16, 61). The question is thus whether, as alleged, Dr. Holdridge's conduct "was unwanted and regarded as undesirable." *Gordon*, 179 F.4th at 272. Plaintiff alleges that each of Dr. Holdridge's alleged advances "triggered a gut-level feeling of revulsion and anxiety," (ECF No. 1 ¶ 31), and that he did not file a complaint because he feared doing so would "jeopardize his employment . . . , given Holdridge's significant authority over him," (*id.* ¶ 80). Moreover, he alleges that when Dr. Holdridge attempted to kiss him, "he rejected the kiss by turning his head." (*Id.* ¶ 57). Those allegations yield the plausible inference that the conduct was unwelcome.

The third element, whether the unwelcome conduct was sufficiently severe or pervasive, presents a considerably higher bar for plaintiffs to clear. *Sunbelt Rentals*, 521 F.3d at 315. As the Fourth Circuit has emphasized, "Title VII does not establish

44

a 'general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). This element has both a subjective and objective component: "[T]he employee must both personally and reasonably believe that the conduct rises to the level of a hostile environment." *Strothers*, 895 F.3d at 331 (citing *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc)). The objective component entails an inquiry into the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The conduct must also be viewed in the context of "surrounding circumstances, expectations, and relationships." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Oncale*, 523 U.S. at 81–82). If the alleged harasser is the plaintiff's supervisor rather than his co-worker, the unwelcome conduct takes on greater severity. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (citing *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)).

45

Defendant argues that Plaintiff at best points to a series of isolated incidents that cannot meet the third element's high bar. He relies on *Albero v. City of Salisbury*, 422 F.Supp.2d 549 (D.Md. 2006), in which a court in this district granted summary judgment to the defendant on a longtime zookeeper's sexual harassment claim arising out of a workplace rife with sexual remarks, including the plaintiff's own.  He contends that Plaintiff, like the zookeeper in *Albero*, is too vague about dates and the frequency of the alleged harassment, and that he does not attempt to show that any of the alleged harassment was threatening or humiliating.  (ECF No. 36-1, at 25).  But in *Albero*, the plaintiff had been working for the defendant for eighteen years, 422 F.Supp.2d at 558; here, Plaintiff worked for Defendant for a mere ten months, (ECF No. 1 ¶ 7), and he alleges that the unwelcome conduct spanned nearly the entire duration of his employment.  Moreover, unlike the employee in *Albero*, Plaintiff alleges offensive touching, (*id.* ¶¶ 40, 42, 56, 79), fear that opposing it would "jeopardize his employment," (*id.* ¶ 80), and personal humiliation, (*id.* ¶ 82).  Accordingly, *Albero* has little to say about Plaintiff's claim.

Still, Plaintiff's sexual harassment claim is a close call. Many of his allegations readily appear to be mere "offhand comments," *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Faragher v.*

46

*City of Boca Raton*, 524 U.S. 775, 788 (1998)), such as Dr. Holdridge's discussion of her marital issues, desire to get a tattoo, and wish to exchange bottles of red wine, (ECF No. 1 ¶¶ 29, 79), or incidental touching, such as brushing up against Plaintiff while putting on her shoe covers, (*id.* ¶ 22).  But his allegations that she, as his supervisor, repeatedly massaged him, (*id.* ¶¶ 40, 42, 79), implicitly propositioned him by removing her wedding ring and saying "[s]ometimes I wonder if anyone would notice if we just disappeared for a while," (*id.* ¶ 43), and then later attempted to kiss him, (*id.* ¶ 56), are enough to clear the severe-or-pervasive bar at this stage.  In fact, "even a single nonconsensual kiss can constitute severe conduct," *Johnson v. Becerra*, No. 19-cv-1859-SAG, 2022 WL 2528430, at *9 (D.Md. July 7, 2022), particularly when the alleged harasser is a supervisor.

Although the other surrounding circumstances bear on the severity of the conduct, too, they remain unclear.  Perhaps most salient is the fact that, immediately preceding Dr. Holdridge's alleged attempted kiss, Plaintiff gifted her a bottle of red wine and chocolates on Valentine's Day.  (ECF No. 1 ¶ 54).  Plaintiff maintains that it was a birthday gift, (*id.*), but Dr. Holdridge responded after receiving the gift by wishing Plaintiff a "Happy Valentine's Day," (*id.* ¶ 56), suggesting she may have interpreted

the gift as a romantic, rather than collegial, gesture.  Without more clarity regarding the nature of that interaction and viewed in the light of Dr. Holdridge's alleged conduct in the preceding months, Plaintiff's allegations suffice for now.

The fourth element "requires that the offensive conduct be imputable to the employer."  *Strothers*, 895 F.3d at 332 (citing *Boyer-Liberto*, 786 F.3d at 278).  "If the harasser is a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions."  *Id.* at 333 (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013)).

Defendant's only argument regarding the fourth element is an affirmative defense, (ECF No. 36-1, at 25–26), namely the so-called *Faragher-Ellerth* defense that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise," *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 328 (4th Cir. 2012) (quoting *Ellerth*, 524 U.S. at 765).  Generally, courts "cannot reach the merits of an affirmative defense" on a motion to dismiss for failure to state a claim.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc).  In "relatively rare circumstances," however, a

court can rule on an affirmative defense at the pleading stage "if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint.*'"  *Id*. (alteration in original) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (citing *Desser v. Woods*, 266 Md. 696, 703–04 (1972)).  Defendant's reliance on exhibits outside the complaint to assert his *Faragher-Ellerth* defense demonstrates that the facts necessary to decide it do not all appear on the face of the complaint.  Accordingly, the defense will not be considered. Defendant does not otherwise challenge the imputability of Dr. Holdridge's conduct to him.

Because Defendant's challenges to the first, third, and fourth elements of Plaintiff's sexual harassment claim fail, his motion to dismiss Count II will be denied, although the claim will be dismissed as to the other three government defendants.

### E.   Count III: National Origin Discrimination

Plaintiff brings a claim of national origin discrimination under both Title VII and the INA, which will be addressed in turn. He can state a claim under Title VII by either alleging direct evidence of discrimination or, in the absence thereof, facts from which a *prima facie* case can be reasonably inferred: "(1) membership in a protected class; (2) satisfactory job performance;

49

(3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190.  Plaintiff contends that Defendant unlawfully discriminated against him on the basis of his Ukrainian nationality and TPS immigration status when it participated in his immediate termination outside the allegedly ordinary process. (ECF No. 1 ¶¶ 87, 89).  He alleges that he was treated worse than employees who were U.S. citizens.  (*E.g.*, *id.* ¶ 89).  On the other hand, Defendant argues that Plaintiff failed to exhaust his administrative remedies for the national origin discrimination claim, (ECF No. 36-1, at 11-13), has not identified an adverse action that Defendant took, (*id.* at 18-19), and has not identified an adequate comparator, (*id.* at 19-20).  Although the issue of administrative exhaustion is potentially troublesome, the court need not reach that affirmative defense because Plaintiff fails to state a claim.

A fatal flaw pervades Plaintiff's national origin discrimination claim: It is in fact an immigration status discrimination claim, which is not cognizable under Title VII. One court in the Fourth Circuit recently explained the distinction:

> "Discrimination based on one's status as an immigrant might have been included within the ambit of 'national origin' discrimination, but

> that is not the path the Supreme Court has taken. The Court instead chose almost [53] years ago to adopt a narrower definition of national origin discrimination for purposes of Title VII." *Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 940 (7th Cir. 2012) (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973)). In *Espinoza*, the Supreme Court concluded that the phrase "national origin" in Title VII referred to "the country from which you or your forbears came." *Espinoza*, 414 U.S. at 89. "Thus, national origin discrimination as defined in Title VII encompasses discrimination based on one's ancestry, but not discrimination based on . . . immigration status." *Cortezano*, 680 F.3d at 940.

*Ofoche v. Apogee Med. Grp., Va., P.C.*, No. 18-cv-6, 2018 WL 4512076, at *4 (W.D.Va. Sep. 20, 2018). Whether Plaintiff's allegations are assessed as direct evidence of discrimination or against the *prima facie* elements of discrimination, they inescapably reveal that immigration status is the true factor at issue.

First, it is worth considering whether Plaintiff plausibly alleges direct evidence of discrimination, even though Defendant makes the uncontested assertion that Plaintiff does not allege facts suggesting direct evidence of discrimination. (ECF No. 36-1, at 16 n.3). Allegations indicating direct evidence of discrimination can include "that the employer announced, or admitted, or otherwise unmistakably indicated that [national

51

origin] was a determining factor." *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982) (citing *Spagnuola v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir. 1981)).   Plaintiff alleges that someone, possibly CRL HR's Ms. Richardson, told him that "due to Plaintiff's position as a TPS-protected immigrant contractor, it was administratively less complicated for NIH to request his removal compared to actions that might be taken against a U.S. citizen or high-ranking federal employee such as Holdridge." (ECF No. 1 ¶ 90).   Putting aside the lack of clarity on who made this representation to Plaintiff, it is plausible that it reflects an admission that Plaintiff's immigration status was a determining factor in his removal and subsequent termination.   But discrimination because of immigration status is not within the purview of Title VII's remedial scheme.  In fact, the only specific comment Plaintiff alleges anyone made related to his specific nationality was Ms. Richardson's comment to Plaintiff that "challenging the termination 'doesn't make sense—this isn't like the Russia-Ukraine War.'"  (*Id.* ¶ 91).  Regardless of whether such an analogy was appropriate, it does not betray any hostility to Ukrainians, it does not suggest any causal link between Plaintiff's nationality and his termination (as opposed to his challenge to the termination), and it was not made by an employee of Defendant.

It is likewise not actionable against Defendant under Title VII. Accordingly, Plaintiff fails to state a claim based on allegations of direct evidence.

Viewing Plaintiff's allegations through the prism of a *prima facie* case yields a similar conclusion. Even assuming Plaintiff adequately alleges an adverse employment action, his comparator allegations hinge on his immigration status rather than his nationality. Without identifying any specific comparator other than perhaps Dr. Holdridge, Plaintiff repeatedly compares how he was treated to how U.S. citizens were generally treated. (*Id.* ¶¶ 89, 90, 94a, 94b, 94c, 94d, 94e, 94f). He does not allege a foreign national comparator with a similar immigration status, such that national origin could be isolated as the plausible cause of differential treatment as opposed to immigration status. *See Ofoche*, 2018 WL 4512076, at *4 (dismissing Nigerian H-1B visa holder's national origin discrimination claim because he failed to allege, for example, that a "French medical doctor, who also possesses an H-1B visa, would not be subject to the same 'unsafe' and 'untenable' working environment"); *Ofoche*, 2019 WL 254674, at *2 (dismissing the same plaintiff's amended national origin discrimination claim because the only additional comparator he identified was a "*white*, *American* [employee] who is *not* a foreign

53

national"). Nor does he plausibly allege that his immigration status was a proxy for his national origin in any way. *See Ofoche*, 2019 WL 254674, at *3 (citing *Espinoza*, 414 U.S. at 92). And although he alleges upon information and belief that he was replaced by someone who is not Ukrainian, (ECF No. 1 ¶ 92), the fact "[t]hat one's replacement is of another [national origin] . . . is neither a sufficient nor a necessary condition" of a plausible national origin discrimination claim, *Miles v. Dell, Inc.*, 429 F.3d 480, 486 n.3 (4th Cir. 2005) (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)). Without more, a *prima facie* case of national origin discrimination cannot reasonably be inferred from Plaintiff's allegations, and his Title VII claim fails. Because Plaintiff has not pointed to any additional facts that would change this conclusion, leave to amend will be denied.

Plaintiff also brings his national origin claim under the INA, 8 U.S.C. § 1324b. (ECF No. 1, at 2, 20). That provision makes it an "unfair immigration-related employment practice for a person or other entity to discriminate against any individual . . . with respect to . . . the discharging of the individual from employment because of such individual's national origin." 8 U.S.C. § 1324b(a)(1)(A). Defendant argues that this court lacks

54

jurisdiction over Plaintiff's INA claim because it "must first go to the special counsel, [then to] an administrative law judge and then [be] appealed to the 4th Circuit."  (ECF No. 36-1, at 15 n.2 (citing 8 U.S.C. § 1324b(i))).  Plaintiff does not disagree and appears not to oppose dismissal of his INA claim against Defendant. (*See* ECF No. 39, at 9-10).

To the extent Plaintiff even continues to press his INA claim, Defendant is correct.  Section 1324b does not provide a private right of action.  *Wanyu Zhang v. Nat'l Pub. Radio, Inc.*, No. 25-cv-699, 2025 WL 4033858, at *12 (D.D.C. Dec. 18, 2025), *appeal docketed*, No. 25-7207 (D.C.Cir. Dec. 31, 2025); *Jean-Louis v. Cmty. Agency for Senior Citizens*, No. 25-cv-2820, 2025 WL 2662515, at *2-3 (S.D.N.Y. Sep. 17, 2025); *Ravines de Schur v. Easter Seals Goodwill N. Rocky Mountain, Inc.*, No. 22-4055, 2023 WL 4635890, at *3-4 (10th Cir. July 20, 2023); *Yang v. Awbury Grp., LLC*, No. 22-cv-640, 2022 WL 16587254, at *2 (S.D.Tex. Sep. 19, 2022).  Instead, it requires the filing of a complaint with the Office of Special Counsel, 8 U.S.C. § 1324b(b)(1), followed by a proceeding before an administrative law judge ("ALJ"), *id.* § 1324b(d)-(g), and then vests exclusive jurisdiction to review the ALJ's determination in the appropriate United States Court of Appeals, *id.* § 1324b(i). Although Plaintiff alleges that he filed a complaint with the

55

Office of Special Counsel, (ECF No. 1, at 24–25), he has provided no further information on any related administrative proceedings, and the conclusion of those administrative proceedings is reviewable only by the Fourth Circuit.  When "Congress leapfrogs district courts by channeling claims through administrative review and directly to federal appellate courts[,] . . . federal district courts lack subject matter jurisdiction to hear those claims." *Bank of La. v. Fed. Deposit Ins. Corp.*, 919 F.3d 916, 922 (5th Cir. 2019) (citation modified); *cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (explaining that when Congress bypasses district courts and instead provides for "review in a court of appeals following the agency's own review process," it "divests district courts of their ordinary jurisdiction over the covered cases").[6] Accordingly, this court lacks jurisdiction over his INA claim, and

---

[6] In *Ravines de Schur*, an unpublished Tenth Circuit case, the court concluded that § 1324b's lack of a cause of action should lead to a merits dismissal rather than a jurisdictional dismissal. 2023 WL 4635890, at *4.  Although it may be true that the lack of a cause of action is not jurisdictional, the *Ravines de Schur* court did not directly address the *separate* jurisdictional consequences of § 1324b's channeling provisions.  Because courts routinely find similar provisions to oust the district courts of jurisdiction, *Ravines de Schur* is unpersuasive.

56

it will be dismissed without prejudice to Plaintiff's seeking relief and review through the proper channels under § 1324b.[7]

### F.   Count IV: Retaliation

Finally, Plaintiff brings a claim of retaliation under Title VII and the INA.  Title VII protects federal employees from retaliation, meaning discrimination because the employee "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  *See* 42 U.S.C. §§ 2000e-3(a), 2000e-16(d); *Laurent-Workman*, 54 F.4th at 212 ("[T]he anti-retaliation provision's protections are incorporated by the federal-sector provision.").  A *prima facie* case of retaliation has three elements: (1) the employee engaged in a protected activity; (2) his employer took an adverse action against him; and (3) the two

---

[7] The INA also allows any "protected individual" to bring a claim for discriminatory discharge because of his or her citizenship status.  8 U.S.C. § 1324b(a)(1)(B).  Plaintiff does not specifically bring a claim under this provision.  In any event, he does not appear to meet the definition of "protected individual," which does not include individuals here on TPS.  *See id.* § 1324b(a)(3)(B) (defining "protected individual" to include aliens granted lawful permanent residence or admitted under 8 U.S.C. §§ 1157, 1158, 1160(a), and 1255a(a)(1), but omitting those aliens admitted under the TPS statute, § 1254a).  And the court would lack jurisdiction over such a claim for the same reasons it lacks jurisdiction over the national origin claim.

events were causally linked. *Laurent-Workman*, 54 F.4th at 212 (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016)).

Plaintiff alleges that he engaged in the following protected activities: "participating in internal employment investigations conducted by CRL, where he reported and provided details regarding Holdridge's sexual harassment and the resulting hostile work environment; making an internal report to CRL HR (Jessica Richardson) on February 14, 2025, both rebutting Holdridge's allegations and raising concerns about her own conduct; filing a formal EEO complaint with NIH on or about February 22, 2025, and subsequently filing an external Charge of Discrimination with the EEOC." (ECF No. 1, at 24). He also submitted complaints to other federal and state agencies and contacted his congressional representatives. (*Id.* at 24–25). He alleges that, in response, Defendant and CRL took the following adverse actions: "fabricating or exaggerating allegations against Plaintiff"; "fail[ing] to give fair and equal weight to Plaintiff's factual allegations concerning the conditions of his employment under Holdridge's supervision; fail[ing] to conduct a thorough factual investigation"; "summarily terminat[ing] Plaintiff; and barr[ing] him from being transferred to another facility or rehired by

58

Defendant CRL." (*Id.* at 25-26). Defendant does not contest that Plaintiff's actions constitute protected activities; instead, it argues briefly that Plaintiff does not identify a true "adverse action," (ECF No. 36-1, at 22 n.5), and then focuses principally on an asserted causation deficiency in the complaint, (*id.* at 21-22).

As an initial matter, Plaintiff does not distinguish between the actions taken by Defendant and those taken by CRL when he lists the adverse actions under Count IV. Although Defendant and CRL are considered joint employers for the purposes of this motion to dismiss, CRL's actions are not automatically attributed to Defendant. Rather, being joint employers "only affects each employer's liability to the employee for their *own* actions, not for each other's actions." *Lee v. Mattis*, No. 17-cv-2836-PX, 2018 WL 3439261, at *12 (D.Md. July 17, 2018) (collecting cases). Earlier in the complaint, however, his allegations are somewhat clearer. He attributes the purportedly false allegations to Defendant via Dr. Holdridge, (ECF No. 1 ¶¶ 58-59), the failure to give fair consideration to his allegations and conduct a thorough investigation to CRL, (*id.* ¶¶ 62-64), the termination to both Defendant and CRL, (*id.* ¶ 62), and the transfer denial and classification as not "re-hirable" to CRL, (*id.* ¶¶ 61, 65). In

59

other words, the only adverse actions he specifically alleges that Defendant took are the supposedly false allegations that preceded his termination and the termination itself.

As to those alleged adverse actions, Plaintiff fails to allege that his protected activities enumerated above were the cause. To support causation, a plaintiff must allege at least that "the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity." *Gibson v. Marjack Co.*, 718 F.Supp.2d 649, 655 (D.Md. 2010) (citing *Causey v. Balog*, 162 F.3d 795, 803-04 (4th Cir. 1998); *Dowe v. Total Action against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). But Plaintiff alleges that he did not engage in protected activity until "*immediately after* his wrongful termination." (ECF No. 1, at 24 (emphasis added)). Because Plaintiff's protected activities did not precede the adverse actions he attributes to Defendant, his Title VII retaliation claim fails.[8] He will have the opportunity, however, to amend his retaliation claim, as explained in the next section.

---

[8] In Plaintiff's response in opposition, he suggests that he also alleged his rejection of Dr. Holdridge's attempted kiss as protected activity. (*See* ECF No. 39, at 22 ("Plaintiff's protected activity is not merely that he rebuffed alleged harassment[.]"), 24 ("[T]he Complaint permits the inference that Plaintiff's . . . rejection of Holdridge's advances w[as] intertwined with the

As with his national origin discrimination claim, Plaintiff brings his retaliation claim under the INA, too.  The INA prohibits "retaliat[ion] against any individual for the purpose of interfering with any right or privilege secured under [§ 1324b] or because the individual intends to file or has filed a charge or a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [§ 1324b]."  8 U.S.C. § 1324b(a)(5).  Because an INA retaliation claim is subject to the same channeling as an INA national origin claim, however, the court lacks jurisdiction over it.  Plaintiff's INA retaliation claim will be dismissed.

### G.   Leave to Amend

As already mentioned, Plaintiff requests leave to amend any of the claims that the court dismisses.  (ECF No. 39, at 1, 10, 32).  Fed.R.Civ.P. 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires."  Accordingly, the Fourth Circuit has instructed that "leave to amend a pleading should be denied only when the amendment would be prejudicial to

---

decision to remove him[.]")).  But Plaintiff was quite clear in his complaint that his protected activity began *after* his termination, and thus after he rejected Dr. Holdridge's attempted kiss.  (ECF No. 1, at 24).  Plaintiff cannot amend his complaint through briefing.  *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands*, *LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Because the case is in its early stages and there is no indication of bad faith, futility is the only relevant ground to consider.  "A proposed amendment is futile when it is 'clearly insufficient or frivolous on its face.'" *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (quoting *Johnson*, 785 F.2d at 510).  In *Save Our Sound*, the Fourth Circuit further explained that "[a] proposed amendment is also futile if the claim it presents would not survive a motion to dismiss."  *Id.* (citing *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995)).

Beginning with the dismissal of Defendants Jayanta Bhattacharya, NIH, and NIAID, there are no additional facts Plaintiff can allege that will change the conclusion that they are not proper defendants under Title VII.  Amendment of the Title VII claims to include them as Defendants would be futile.

Next is Count I, sex discrimination.  Plaintiff's pleading deficiency consists of a failure to frame as an adverse action in Count I an action that he elsewhere alleges Defendant took, namely the request that Plaintiff be terminated.  (ECF No. 1 ¶¶ 59, 62).

62

There is little doubt that a formal request for termination is an "employment-related decision" and thus a personnel action under 42 U.S.C. § 2000e-16(a).  *Babb*, 589 U.S. at 405.  Because Plaintiff's pleading deficiency is readily curable, amendment is not futile and will be allowed.

Count III, national origin discrimination, is a different story.  Plaintiff has not pointed to any additional facts that would suggest he was the victim of national origin discrimination as opposed to, if anything, immigration status discrimination. Amendment of this claim would be futile, thus leave to amend will be denied.

Finally, the court cannot say that amendment of Count IV, retaliation, would be futile.  Plaintiff indicates in his response in opposition that his rejection of Dr. Holdridge's kiss could constitute protected activity, which preceded his termination.  In addition, the affidavit Plaintiff attaches to his response in opposition suggests the following: (1) his termination was not finalized until February 20, six days after he first complained to CRL HR; (2) individuals at NIH/NIAID were aware of his complaint to CRL in the interim; and (3) communications between CRL, NIH/NIAID, and Dr. Holdridge continued until at least February 24. (ECF No. 39-1).  It is thus plausible that Dr. Holdridge and/or

other individuals at NIH/NIAID made allegations and took consequential actions against Plaintiff with knowledge of and immediately after his protected activity.  Accordingly, Plaintiff will be permitted to amend Count IV.

## V.   Conclusion

For the foregoing reasons, Defendant's motion to dismiss or, in the alternative, for summary judgment will be granted in part and denied in part, and both motions filed by Plaintiff will be denied.  Plaintiff will have the opportunity to amend Counts I and IV of his complaint within twenty-one (21) days.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
